Mr. Charleston, good morning. Welcome. Good morning, Your Honor. Please proceed. Thank you. Frederick P. Charleston, appearing on behalf of the petitioner Fransonia Owens. This is the appeal of Ms. Owens from her removal as the Supervisor of Supply Processing and Distribution Division at the Veterans Administration Medical Center in Baltimore, MD. You can assume we have the facts well in mind from studying the briefs and the records. Yes, sir. So you don't need to use any of your scarce time on that. Well, I would certainly like to set the stage by talking about the myriad of responsibilities that she had at the medical center because I think it's related to the situation that occurred in her removal. Well, let me ask you this. Yes, sir. In your grave brief, you seem to emphasize the notion that the administrative judge relied excessively on circumstantial evidence and overlooked highly significant evidence that was more direct. But I couldn't see any clarity about what you were referring to. It seemed like there were many witnesses who all gave testimony that was certainly direct evidence about things they had seen, the investigating agents and many other officials. So I couldn't quite follow this idea that the A.J. administrative judge didn't have direct evidence and only had circumstantial evidence. Can you clarify that? Yes. For example, the investigation into the vehicle led to the investigation into whether or not Ms. Owens was in fact working the hours she said she was working. One prime example, and the overtime issue was the main issue with regards to falsification, at least when the investigation began. At the end, they had some issues about signing in at one point and actually starting work about maybe half hour or so later. But with regards to, for example, the overtime issue, one of the agents testified, as I recall, that they went up to her unit at night when she was supposed to be working this overtime and they looked at her office and they didn't see a light on. Well, based upon, I assume, based upon that evidence, the judge found that she wasn't working that night. The fact of the matter is, the evidence, the record is clear, she was supposed to be working in the warehouse. If you want to know that she's working, that's where you go. I don't think there's any dispute that the work she was supposed to be doing at night was at a different location than her office where she was supposed to be during the day. I don't think anybody disputes that. So to the extent that there was reliance on not seeing her office light on, perhaps you have a point. But the administrative judge went into some detail on this and ultimately finds that the agency's proven that the appellant knowingly supplied incorrect information with the intent of defrauding, deceiving, misleading regarding her attendance record. The charge is sustained. They've gone through the information on her time cards was inconsistent with the surveillance of the appellant on several dates. Why isn't this substantial evidence to support the charge? Well, that aspect of it is difficult. Because there was evidence in her documents produced that she signed in at one time and actually started working another time. She denied that, but the evidence is there, so I can't stand and argue that it isn't. But to the extent that it was used to show this overall misuse of overtime. Remember the big deal, Judge Rader, was that she had $23,000 to $24,000 in overtime. That was the big deal in the case. It wasn't whether she signed in early or not. And in fact, it dawned on me as I'm looking through the record last night, that there Even her supervisor testified. But Mr. Charleston, it can't be disputed, seriously, can it, that time cards are supposed to reflect actual presence. Therefore, if the time cards day after day after day don't reflect actual presence, it's not a satisfactory explanation to say, well, some days I worked even longer and other days I worked shorter and it averaged out. Because the time card, by definition, each day is supposed to reflect the actual hours. Now, I understood that with respect to many days, she basically conceded that she wasn't there for some of the hours. For example, she indicated that she drove home and got some food or had dinner and then came back. So to that extent, there's no dispute. She agrees she wasn't there for every hour shown on the time card. Why doesn't that strongly support the judge's finding that Judge Rader just read and summarized? Well, with respect to her going home, her testimony was that she worked through lunch. But it's the same problem. Mr. Charleston, moving to the next one, she admits that she used poor judgment regarding the automobile use, right? Yes, sir. And so now we have two charges that the evidence seems to support, the misuse of the automobile and the falsification of time cards. How does this court overcome that kind of evidence? Well, difficult to argue. And in fact, I didn't try to argue that what I called was a technical violation. She didn't have written permission. This is a unique situation that didn't seem to make any difference to the administrative law judge. But didn't the agents who surveilled her testify that they never saw her using her own vehicle? She was always using the agency vehicle, including to commute between her residence and the workplace. Well, I think what they indicated was that So you can call it a technical violation if you want. But it was certainly a repeated. It was a regular practice. So it wasn't trivial in quantity. I agree with that. And of course, that wears out the car. And it uses gasoline. And she had an agency credit card to buy gasoline. I mean, she might really consider herself lucky she didn't get charged with misusing the credit card, as well as these other three infractions. But the record is clear that they never saw her going anywhere other than home or work in that vehicle. There was never any errors. But going home is not permitted. She doesn't have to go to Atlantic City to be misusing the car. If she goes home, she's misusing the car. I don't deny that it was a technical violation. The only argument that I've tried to make and can continue to make is that there were exceptional circumstances as to why she did it and the fact that there was no intent on her part to violate the regulations. On the charge involving the oxygen supply, I was interested to see that according to the records of the air products company, the order placed with them, presumably over the phone by your client, was for a delivery either on the 16th or the 17th. And they, in fact, did deliver in the a.m. hours of the 17th. But that was clearly way too late because the oxygen supply was already known to be low as of the 16th. So that if it's accurate that she told them deliver either on the 16th or the 17th, wouldn't that be extremely negligent right there? Well, it was my understanding that that indication in air gas was wrong and that ultimately even the board of inquiry found that that was incorrect on their part. I don't think the board of inquiry ever found that she didn't order the gas properly, order the oxygen, I'm sorry, properly. Their concern with her was the lack of coordination that she was going to leave the next day. Well, what about the logbook? It's my recollection that the logbook indicated that she failed to check the quantity and pressure of the oxygen supply on a regular basis as required. So that aside from this one delayed delivery, she's already in default of her responsibilities for not checking the oxygen supply at frequent enough intervals. One of the things they did not produce and they ultimately developed were written guidelines as to how often these things were considered. It may be that there weren't written guidelines, but why doesn't the logbook contain sufficient proof that she failed to monitor the oxygen supply with the required frequency? Well, again, her testimony was that she did that. She testified how things had changed with regards to how the oxygen was ordered. At one time the company... But wasn't it part of her job not only to order oxygen but to monitor the oxygen supply on a regular basis? And the logbook reflects the extent to which she did it and the logbook showed she did not do it frequently or regularly. Well, again, it's a matter of interpretation as to how often she's supposed to do it. And that's why I get back to not having any written guidelines as to how it's supposed to happen. And I just might add, again, this is one of those cases where it's just a lot of things out there. It's difficult to look at. I wasn't involved in the hearing, but it was just very difficult. And that is the person who handled this before her didn't have nearly the responsibilities that Ms. Owens had. Ms. Owens supervised 15 to 17 people. They had her running all around to the different sites, picking up supplies, dropping off supplies. They had her working late at night to get this warehouse taken care of. And when she was brought in, she was told that she had a stack that was lackadaisical and she had to crack down on it. So it's kind of hindsight for me to say maybe it was unfair for her to have that responsibility, but that's the agency's call to make. I understand that. And perhaps it was her call to make sure she understood everything. But when you put everything into context, I think it's just all blown out of proportion in terms of what her discrete responsibilities were. Do you want to save the rest of your rebuttal time you reserved? Yes. I tried to reserve five minutes, and one is already used. All right. Thank you. Thank you, Mr. Charleston. Mr. Deerberg, we'll hear from you. It pleases the court. Substantial evidence supports all the charges against Ms. Owens, and the penalty is not outrageously disproportionate to the proven offenses. As of the first charge of falsification of time records, it was not a minor isolated falsification of time records. As we indicated in our brief, there were 11 days in which the investigators observed her either going from her home to work or leaving the office going to home or both. And out of those 11 days, on eight days she overstated her attendance by an average of three hours each day. I don't really understand that to be denied. It sounds like in her testimony and as voiced by counsel, she agrees that the time records weren't accurate on those and other days. And he, in effect, says it's excusable because some days when she worked even longer, she didn't charge more time and it sort of averaged out. That's not correct. She, throughout the proceeding from the start of the case, has denied any falsifications. She has indicated that the records are accurate. That's been her assertion at all times. She's never had an explanation as to why they're inaccurate. At times she's had an explanation as to, for example, why she showed up for work late, but she never explained then why for that day she would claim that she was working at an earlier point in time. Particularly, it's something that's important in this case, that on three days, the first three specifications are for days in which she claimed to be working at an earlier time than she actually showed up. And on those same days, she claimed overtime for those days or for some portion of those days. So there was no explanation for her that these were errors. She didn't say that there were any errors. She said that her time records were accurate. Are you planning to address any of the arguments made here today by Mr. Charlson? Yes, Your Honor. As to one issue that was addressed, whether there was direct evidence, circumstantial evidence, on the falsification of time records, there was direct evidence. The investigators observed her going from her home to work. In one case, they observed her going to Burger King at 9 o'clock in the morning when she claimed to be working at 7.30 that day. So there was direct evidence not only as to that charge, but also as to the misuse of the government car and as to all of the charges in this case. As to the misuse of the government car, one of the issues raised today was that it was a technical violation and that it was under exceptional circumstances. There was one allegation about going to one location, dropping off the car, and then there were menacing use. But she testified that ever after that, it became a pattern to drive directly at home. There were no exceptional circumstances that would indicate that it is proper for her to do so. Mr. Dierberg, this is an individual who had 28 years of rather exemplary service and had risen through the ranks. Was there adequate consideration given to the fact that this is a pressure job with lots of demands and that Ms. Owens was actually doing the best she could within all those circumstances? Was that adequately considered by the judge? Yes, Your Honor, that was considered. The amount of time that she worked, the length of her service was considered, and as we pointed out in our brief, the MSPB had in the past affirmed a case or affirmed a removal of an employee who had served about the same amount of time for both. Isn't it true that she had no disciplinary infractions previously? I don't believe that there is any indication that there was a prior disciplinary action. So she had a clean record and 28 years of adequate service. Yes, Your Honor. And she had satisfactory performance ratings year after year after year. Isn't that also true? Yes, Your Honor. Well, in view of those and similar circumstances, doesn't Judge Rader have a powerful point that maybe these derelictions and infractions by her as proven would merit some discipline but maybe not the ultimate discipline of removal from office? Your Honor, the starting point, I think, for this is the standard of review of the penalty, and that's what we're discussing here, I believe, is the penalty, the appropriateness of the penalty. And that standard is whether or not the penalty is outrageously disproportionate. In some cases, the phrase unconscionably disproportionate has been used. This is a really high standard to meet. We're probably familiar with those words and standards because we wrote them and we apply them every day, so you don't need to spend a lot of time telling us what the verbiage is. The question really is on the facts of this case. And again, Your Honor, the facts of this case, one other relevant factor in determining the penalty is the fact that she's a supervisor. For a long period of time, she's been an employee for- See, to me, the question is whether a six-month suspension without pay, for example, would have been punishment that fits the conduct. And if so, wouldn't that suggest that maybe removal might be an excessive penalty? Your Honor, the penalty was appropriate given the high standard and given any standard, really. The penalty was appropriate. Why? Because given the fact that she was a supervisor, given the fact that she falsified her time records, which this court has held in the past, it's a very serious offense. And just for the first offense, it can be a penalty of removal. MSPB has recognized the seriousness of the offense. They've affirmed a removal based on $84 of falsification, $300 in one case in which the person had been employed for about that amount of time. These are serious offenses. Was the under-attendance monetized? The under-attendance? Yes. Was it ever quantified and then converted into dollar values? In this case, Your Honor, the specifications were not monetized, no. But I guess the point I was trying to make is that this court has, in the past, indicated that falsification is a very serious offense. MSPB has recognized- There's no question that it's serious, but the question is under the circumstances of each particular case, what penalty is excessive? And I don't hear you responding at all to my suggestion that perhaps, for purposes of argument at least, the agency would have had a sufficient penalty with six months' suspension without pay or maybe a suspension without pay coupled with a demotion as opposed to a removal of a 28-year employee. Again, Your Honor, I think I have to go back to the standard that it's not for this court to decide the appropriate penalty. As a first instance, this is a reviewing body to look at the decision made by the agency. We know all that. Of course we're not setting the penalty. Of course we're just a reviewing body. Of course it has to be disproportionate. We know all that. So why is it factually that you think those standards aren't met here? Because, Your Honor, in this case the offenses are serious, and I think there's been really no dispute on their side that these aren't serious offenses. We have serious offenses. We have, in her case, really I think a lack of remorse. And the only case where she showed any remorse really was as to the misuse of the government car, where she said maybe she showed bad judgment. But as to the first charge, she's denied it all the way through. In contravention of very clear evidence that she was falsifying time records, she's been denying it all the way through. In addition, as to the penalty, the appropriateness of the penalty, the oxygen incident seriously affected or could have seriously affected the reputation of the VA. Is your view bottom line that only removal would be an appropriate, reasonable penalty under the facts of this case? Yes, Your Honor. And one other point I'd like to make, Your Honor, is that a lot of the substantial portions of the case was decided based on the administrative judge finding the testimony not to be credible, and those findings are virtually unreviewable. It appears based on the questioning that perhaps this is more an issue of the penalty, and as I've indicated before, the penalty is appropriate. It's certainly not outrageously disproportionate to the criminal offenses. Thank you, Your Honor. Thank you. Mr. Charleston, you have up to four minutes of rebuttal. When this case started out, in terms of investigation, they thought they had a major criminal on their hands. They thought she was running a real estate business. They thought that she was not working anywhere. Why does that matter? I mean, in the end, the charges were what they were, and the evidence was what it was, and the findings are what they were. So how it started maybe has little or no relevance anymore. The point I was getting to ultimately was they needed a scapegoat for the oxygen. They put it on her. It wasn't shared in any way with the director of engineering. In fact, the director of engineering was made the head of a board that investigated this. But even if the director of engineering or some other official at the hospital had major responsibility for the oxygen incident, how does that relieve her? Maybe it means both of them should have been fired, but why does it mean that she can't be fired if she was derelict in her duty regarding oxygen? Well, I believe the evidence shows she was not derelict. She did her duty. Now, as I said, there was some Monday morning quarterbacking that found all different kinds of things that she could have done. But aren't you assuming that her call on the 16th was soon enough? What if it was already a day or two late? Well, there's no evidence of that. Well, I thought there was evidence that the initial alarm went off showing dangerously low level of oxygen before she made the call. That was a little confusing, and there was some testimony to that extent, but there was testimony just the opposite. Engineering said they didn't get the alarm call. So I admit that was a little confusing, but clearly the alarm did go off on the 17th. As I understand it, a different alarm went off, one that goes off in the wards, which would be heard by all the nurses and patients and family members, probably scared the hell out of everybody in the whole hospital. But I'm talking about the first alarm that's sort of an internal management alarm that presumably would not be heard by the patients. If she hadn't monitored enough to prevent that first alarm from going off, then why isn't that dereliction right there, regardless of the later step of ordering the oxygen? Well, if in fact the first alarm went off because the oxygen level was so low, I agree with you. But as I said, it seems to me there's some real confusion about that. And also the fact that there was testimony that when the alarm would go off, she would not be notified. Engineering would be notified. Why that was, I don't know. Certainly if she's the one primarily responsible, she should have been the one that was contacted. But apparently she was contacted here. I understood that the reason she called Air Products was that the initial alarm had gone off and she was aware of that. I wasn't aware of that. Well, maybe I'm misremembering. We'll check the facts. You're down to just a moment, a minute. As I said, just in wrapping up, I think that with regard to the oxygen, I believe she did her job. I think it was a serious situation and they wanted to escape her. With respect to the vehicle, she took it home. But she had what I felt were reasonable explanations for it and never indicated any intent to violate. With regards to the falsification, no proof that the big ticket item was violated. That was, in fact, the overtime. She denied the signing situation. Apparently this was a sign-in procedure as opposed to a time clock. You've got the testimony of the agent saying, I saw her come in at a certain time. She's saying I came in at a different time. There is evidence to indicate that. But I think that under all those circumstances, the provable evidence does not indicate she should have been fined. And I agree with the court that, well, I agree at least with the questions asked that other disciplines should have been considered, including demotion, suspension, et cetera. All right. Thank you, Mr. Charleston. Thank you. We thank both counsel and recognize the candor with the things that are documented. It's always nice when lawyers don't try to twist the facts and deal the best they can with the facts. Well, we'll take the case under advisement. Thank you, Your Honor.